IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MICHAEL W. BELL,

                          Plaintiff,                          OPINION AND ORDER

   v.
                                                             17-cv-580-wmc
STOUGHTON TRAILERS, LLC,

                          Defendant.

Plaintiff Michael W. Bell alleges that his former employer, Stoughton Trailers, LLC, discriminated against him on the basis of his race in violation of both Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2, and 42 U.S.C. § 1981.  Before the court is defendant's motion for summary judgment, seeking a finding in its favor on liability, or in the alternative, a finding that plaintiff is not entitled to an award of punitive damages. (Dkt. #22.)  For the reasons set forth below, the court will deny the motion, finding that:  (1) a reasonable jury could conclude that Bell was terminated because of his race; and (2) fact issues as to whether defendant engaged in a good faith effort to implement its antidiscrimination policy precludes entry of summary judgment in defendant's favor as to an award of punitive damages.


UNDISPUTED FACTS[1]

**A. Plaintiff's Employment**

Plaintiff Michael Bell, an African-American man, was hired by defendant Stoughton

---

[1] Viewing the evidence of record in the light most favorable to plaintiff as the non-moving party, the following facts are material and undisputed for purposes of summary judgment, except where noted.

Trailers as a production machine operator on June 13, 2011. During his employment, Bell worked on brake presses, shears, saws, punch presses, and in assembly. In 2014, he worked primarily in the sheet metal department on a brake press, a hydraulic-powered machine that bends and forms metal parts used in manufacturing trailers.

Brake press machine operators produce parts, one part at a time, according to blueprints that set forth the specifications of the part. Parts that are outside of specifications are expected to be identified and likely scrapped, which increases Stoughton Trailers' manufacturing costs. To reduce the number of parts that must be scrapped, employees are instructed to perform quality inspections on every third to fifth part to ensure that they match blue print specifications. After completing a single or rack of parts, the operator or operators who formed the parts write their initials and the number of parts produced on a warehouse tag.

Bell was usually assigned to work on a large 400-ton brake press, which often required two machine operators because it was either difficult or unsafe for only one operator to do so. When two operators were needed, more experienced operators were often paired with less experienced operators for training purposes.

**B. November 14 Incident**

On November 14, 2014, Bell set up and calibrated a 400-ton brake press for a two-person run with a less experienced brake press operator, Richard Erbe. Erbe, who is white, began working for Stoughton Trailers in July 2014, initially as a trainee for the first ninety days. Erbe successfully completed this training period on October 27, 2014. While setting up for and running the job on November 14, Bell was neither informed that Erbe required

further training nor that Bell was responsible for training him.

At the start of the run on November 14, department lead Ron Hinds checked one of the parts that Bell and Erbe had produced and confirmed that it was within specifications. Thereafter, Bell claims he checked every third to fifth part by measuring his side to make sure that it was within specifications. As a standard accepted practice, Bell further represents that operators on a two-person run only checked their half of parts to ensure that they were within specifications.[2] He also asserts that he regularly asked Erbe if his side was within specifications. Bell avers that Erbe continued to indicate that "everything was good." (Bell Decl. (dkt. #30) ¶ 21.) Defendant disputes this, however, pointing to Erbe's deposition testimony that Bell and he "weren't checking pieces like we were supposed to" and that he "thought something was odd," but that Bell informed him, "[w]e're good. Let's keep running them [the header channel parts]." (Erbe Dep. (dkt. #20) 15-16.) Erbe also testified that he had never been "put into a position with someone who had more seniority than [he] and was working in a method . . . of not checking parts according to policy." (*Id.* at 20.)

During the run, Bell and Erbe produced 131 parts. While the parties dispute who signed the warehouse tags, both Bell and Erbe's initials were written on the parts' tag, thereby indicating that they had both worked on those parts. The racks of these parts were

---

[2] The testimony of Bell's former supervisor, Dennis Peuvion, supports Bell's representation. At his deposition, Peuvion averred that responsibility for checking parts "might vary . . . but in general, each is responsible for his side of the part." (Peuvion Dep. (dkt. #21) 25.) Defendant attempts to dispute that this was accepted practice but only points to the testimony of another of Bell's supervisor, Jeff Lind, that if an operator signed off on parts completed during a two-person run, "he was jointly responsible for them." (Lind Decl. (dkt. #25) ¶ 32.)

then sent to weld assembly, where it was discovered that they were outside of specifications. Stoughton Trailers subsequently conducted a full inspection and discovered that all 131 parts were outside of the blue print specifications and therefore needed to be scrapped. The production of these parts accounted for an entire work day for both Erbe and Bell and scrapping them resulted in a loss of $2,790 according to Stoughton, although Bell claims that the loss amounted to $1,200. (Pl.'s Resp. to Def.'s PFOFs (dkt. #33) ¶ 52.) Stoughton Trailers further represents that the quantity of defective parts resulted in a shutdown of the welding area, which in turn affected the plant's entire production line. (Def.'s PFOFs (dkt. #24) ¶ 56.)

Bell reports that all errors were caused by Erbe, and the sides of the parts on which Bell worked were within the blue print specifications. He further claims that he, along with several other employees, including Christopher Hoskins, a now former production machine operator, checked the parts after Stoughton's inspection and confirmed that the errors appeared on Erbe's side and not Bell's. (Bell Dep. (dkt. #17) 65; Hoskins Dep. (dkt. #28) 21-22.) He even recounts how Bell's supervisor Jeff Lind informed him that the errors were on Erbe's side. (Bell Dep. (dkt. #17) 70.)

## C. Bell's Termination

Nevertheless, on November 20, 2014, Supervisor Lind called Bell to his office and presented him with a Work Violation Sheet to sign. Lind further informed Bell that he was being terminated as a result of the defective parts that Erbe and he produced on November 14. The Work Violation Sheet specifically stated that the reason for his termination was that:

4

> Employee has been on a Needs Improvement for poor performance in quality within the last six months and has had a few issues with poor quality since . . . .  Employee formed header channels that were not to specification.  All parts were 100% scrap and the loss was over $2,000.  Root cause was failure to follow procedures to regularly check and measure parts . . . .  Employee has been given the expectation to regularly inspect and measure parts to insure they are within specification.  Employee either failed to measure at all or did not measure correctly on a large run of parts . . . .  The amount of loss of parts and interruption to the assembly line was excessive and could have been easily avoided if procedures were followed.  The behavior indicates a lack of concern for quality performance.  Since the employee has been warned about his poor quality performance in the past, this latest incident will result in termination of his employment.

(Lind Decl., Ex. 4 (dkt. #25-4).)

While Bell signed the Work Violation Sheet, he recalls not agreeing with many of the allegations made in it.  Lind also completed a Managers Exit Questionnaire that reiterated Bell's disciplinary history, his failure to maintain an acceptable level of performance, the monetary loss caused by the November 14 incident, and that Bell "often had excessive scrap on even the most basic of bends for jobs."  (*Id.*, Ex. 6 (dkt. #25-6).)  Bell's termination was the first termination of a non-probationary production machine operator who reported to Lind.

Bell represents that no operator had previously been held responsible for a mistake made by another operator.  He specifically points to one white employee, Hoskins, who occasionally made parts outside of specification, but was neither disciplined for the bad parts nor held responsible if the mistakes were attributable to another operator.  (Hoskins Dep. (dkt. #28) 7).  Notably, Hoskins acknowledged utilizing the same technique to check parts during two-person runs that Bell and Erbe had:  Hoskins "would check [his] end, and

then that person would check their end." (*Id.*)

As for Erbe, Lind issued him a Work Violation, which stated that "any further offense may include discipline up to and including discharge." (Lind Decl., Ex. 5 (dkt. #25-5).) Defendant contends that because Erbe had no disciplinary history or history of poor performance, he was merely issued a Work Violation for the November 14 incident and not terminated. (Def.'s Resp. to Pl.'s PFOFs (dkt. #38) ¶ 75; Lind Decl. (dkt. #25) ¶ 31.)

### D. Past Disciplinary Actions

Bell was supervised by Dennis Peuvion from his date of hire until Peuvion's own termination in February 2014. As supervisor, Peuvion conducted Regular Appraisals in which he assessed a variety of target performance categories, including Quality, Quantity, Cooperation, Flexibility/Job Knowledge, and Care & Safety. From his first review of Bell on September 10, 2011, to his final on January 1, 2014, Peuvion almost exclusively rated Bell's performance as "[m]eets basic expectations of job requirements" or "[r]egularly meets the expectations of job requirements." (Bell Decl., Exs. 1-6 (dkt. ##30-1 to 30-6).) Two exceptions occurred when Bell was rated as "[a]bove expected level[/] [f]requently exceeds expectations of job requirements" in Quantity on July 31, 2013, and in Flexibility/Job Knowledge on January 31, 2014. (Bell Decl., Exs. 5-6 (dkt. ##30-5, 30-6).) Under Peuvion's supervision, Bell was never subject to disciplinary action.

Following Peuvion's termination in February 2014, Lind took over as supervisor of the sheet metal department. Lind reviewed performance of operators and issued many

different types of appraisals, including Regular,[3] Needs Improvement, and Probationary Appraisals. Lind followed the same appraisal guidelines and reviewed identical target performance categories that Peuvion had.[4] If a machine operator's performance fell below satisfactory in those categories, Lind issued them an Extra Appraisal followed by a Needs Improvement Appraisal.[5]

During a Regular Appraisal on May 13, 2014, Lind rated Bell as "needs improvement" in the performance expectation categories of Quality and Quantity. Lind also awarded Bell a score of four out of a possible ten points in the three remaining performance expectation categories. As a result, Lind issued Bell an Extra Appraisal that same day, which stated:

> Over the last three to four weeks, Michael [Bell] has had serious quality problems in terms of high scrap, multiple orders that were either done completely wrong or most of the parts were completed wrong. In addition, production lines have shut down as a result of Mike's poor quality and lack of attention to his workmanship. Mike's quality performance must improve immediately. To do this, Mike must make certain that all of his parts have been double-checked by another PMO, inspect at least every three parts for all orders, and have

---

[3] It appears that the parties also refer to "Regular" Appraisals as "Regular Semi-Annual Appraisals." Whether Regular Appraisals occurred on a semi-annual basis is not clear from the record, nor is it material to the motion before the court.

[4] Of particular note is the Quality category which looked to whether operators: (1) demonstrated a minimal number of downstream defects and scrap less than 0.45%; (2) conducted regular reviews of part quality against blue prints; (3) exhibited personal responsibility for their own workmanship; (4) exemplified quality leadership by preventing defects beyond their own work; and (5) identified opportunities and follows through with process improvement. (Bell Decl., Ex. 7 (dkt. #30-7).) It is unclear whether these criteria were used in Bell's evaluations completed by Peuvion, but they appear in at least Lind's July 31, 2014, Regular Appraisal of Bell and are subsequently used in each of Lind's subsequent Appraisals.

[5] The alleged facts do not indicate whether Peuvion regularly followed this kind of progressive discipline program.

ZERO defects for the next 30 days.

(Lind Decl., Ex. 2 (dkt. #25-2) 2.)  The Extra Appraisal further advised that Bell:

> [m]ust correct serious quality deficiencies immediately by paying closer attention to blue prints and checking parts more frequently.  Secondly, overall productivity is very low and too much time (two to three times as long) to setup and prepare [press brake machine] to run jobs.  Failure to improve and get to acceptable performance in all areas within 30 days will result in termination of employment.  Failure to sustain good performance beyond 30 days will also jeopardize your employment.

(*Id.* at 4.)  Bell signed this Appraisal.

On July 31, 2014 Lind again conducted a review of Bell's performance and issued a Regular Appraisal, stating that Bell "need[s] to improve [his] consistency of quality (less scrap during setups) and keep working on [his] production speed to better [his] overall productivity."  (Bell Decl. (dkt. #30) ¶ 2; *id.*, Ex. 7 (dkt. #30-7).)  On August 20, 2014, Lind gave Bell a Needs Improvement Appraisal, indicating that Bell had successfully completed the 30-day review required by the Extra Appraisal issued on May 13.  It also stated that Bell:

> successfully passed [his] extra review period relating to [his] poor performance issues . . . .  For the future, [Bell] must maintain acceptable performance in all areas, including attendance, in order not to jeopardize [his] employment with Stoughton Trailers . . . [and Bell should] continue to check [his] parts often and do not continue to make parts that [he] believe[s] are questionable. Seek assistance, check [his] prints, have [his] first piece parts inspected by a PMT or Takt leader, and maintain consistent work to maximize [his] productivity.

(Lind Decl., Ex. 2 (dkt. #25-2) 9.)

Bell signed this Appraisal form, and he understood that if his performance did not

continue at an acceptable level, he would be terminated.  (Bell Dep. (dkt. #17) 47.)  Lind

did not issue any other Extra or Needs Improvement Appraisals for the remainder of 2014.

### E.  Lind's Conduct and Statements

Bell represents that Lind was harsher in his demeanor, tone and language when

communicating with African-American employees like himself, than with white employees.

(Pl.'s PFOFs (dkt. #35) ¶ 82.)  During his deposition, Bell testified that Lind was in his

opinion at least, "racist," and "every day it seemed like he had something against African-

Americans."  (Bell Dep. (dkt. #17) 18.)  Bell further avers that "if [Lind] would have a

conversation with a Caucasian person, he seemed happy and jolly," but "when he would

have a conversation with an African-American, it wouldn't be so jolly," and Lind had a

"mean . . . demeanor on his face."  (*Id.* at 19-20.).

At his deposition, former employee Hoskins, who is white, testified that Lind was

"very short, rude and abrupt and not professional" when talking to Bell and another

African-American employee, Jamie Nash, but "cordial" when speaking with white

employees.  (Hoskins Dep. (dkt. #28) 16).)  Hoskins also stated that Lind was "vocally

rude," "wouldn't finish a conversation" with Bell or Nash, and would "walk away" when

they attempted to speak with Lind.  (*Id.* at 24-25.)  Indeed, according to Nash's testimony,

Lind was "targeting blacks" that fell asleep during weekly safety meetings.  (Nash Dep.

(dkt. #18) 50.)  Although both white and African-American employees occasionally fell

asleep during the meetings, Nash testified that Lind only "called out" and brought

attention to sleeping African-American employees, particularly Bell and Melvin James.  (*Id.*

at 23-24.)

At his deposition, James testified that he worked on a 400-ton break press with a white employee, Tim Fuller, who had worked at Stoughton "in excess of twelve, fifteen years" and "knew more than [James] did." (James Dep. (dkt. #19) 11.) James stated that if parts that the two made exhibited a defect or error, Lind "spent a little extra time telling [James] what [he] did wrong and not saying much to Tim." (*Id.* at 11-12.) Even when Fuller's side deviated further from specifications than James', Lind "didn't use the same tone or spend as much time talking to Tim about the mistake as he did with [James]." According to James, "[t]here was no mistake that [Lind] meant to let [James] know that [he] was doing something wrong" but Lind treated any error on Tim's part as "just a mistake." (*Id.*) And on at least one occasion where the two produced bad parts, Lind threatened James with termination but said nothing to Fuller. (*Id.* at 56.)

Bell also represents Lind made ambiguous comments that were actually veiled racist remarks. While there is no evidence that Lind used any racially derogatory terms, Peuvion testified that while both he and Lind were employed at Stoughton, Lind made comments that led Peuvion to believe that Lind was referencing employees' worth and abilities in terms of "their race and their education." (Peuvion Dep. (dkt. #21) 37-39).) At his deposition, Peuvion testified that Lind's comments made it "very clear" to him that Lind believed African-Americans "are less able to do work and . . . time shouldn't be wasted on them over other people." (*Id.* at 38.)[6]

---

[6] Peuvion also testified that "several people" made comments to him related to Bell that "would suggest that due to . . . his race and education, they felt [Bell] wasn't able to perform a job any more difficult than a sheer operator where you just do something really simple all day." (Peuvion Dep. (dkt. #21) 38.) Peuvion did not assign specific comments to specific individuals, and in particular does not indicate whether Lind or another decisionmaker was one of the individuals who

In contrast, Stoughton Trailers avers that employees characterized Lind as harsh or abrasive with *everyone*, regardless of their race. (Def.'s Resp. to Pl.'s PFOF (dkt. #38) 52-53.) During his deposition, when asked if Lind was "a jerk" to both black and white employees, James testified that Lind was "a jerk, period." (James Dep. (dkt. #19) 18.) He also recounted that "almost everyone" in the sheet metal department complained about Lind, no matter their race. (*Id.* at 29.)

Stoughton Trailers also points out that before the November 14 incident, Lind issued the same number of disciplinary "Extra" and "Needs Improvement" Appraisals to African-American as he did to white employees. (Def.'s PFOFs (dkt. #24) ¶P 27-29.) Specifically, one went to Lonn Abbot, a white employee, and the other went to Bell. (*Id.*) Moreover, at least one African-American employee, Nash, had no problems working with Lind one-on-one and received higher performance ratings from Lind than he had from Peuvion. (Nash Dep. (dkt. #18) 16-19, 21.)

## F. Antidiscrimination Policy

Throughout the time that Bell was employed by Stoughton Trailers, the company maintained Anti-Harassment and Non-Discrimination policies. Defendant claims that these policies prohibited all forms of discrimination and harassment, including discrimination on the basis of race, and contained provisions for reporting complaints of discrimination or harassment. (Def.'s PFOFs (dkt. #24) ¶ 82.) The policy stated, in part,

---

made such comments. As such, the court has not considered this purported evidence in determining whether plaintiff has put forth sufficient evidence to demonstrate that he was terminated because of his race.

that:

> the company strives to provide an environment free from all forms of harassment, intimidation, or discrimination based on age, race [list of protected categories] . . . .  As part of this policy, Stoughton Trailers, LLC prohibits anyone from basing a personnel decision (including decisions affecting hiring, promotions, transfers, work assignments, receipt of benefits or participation in Company programs) on an individual's age, race . . . .

(Schieldt Am. Decl. (dkt. #15) ¶ 3; *id.*, Ex. 1 (dkt. #15-1).)

Stoughton Trailers also engaged outside counsel to conduct in-person training of its supervisors and managers on how to abide by and enforce this policy.  Employees who attended the in-person training were required to sign attendance sheets, and for those who could not attend in person (due to illness or scheduled vacation), they were still required to go through the training materials and sign an acknowledgement form, although in fairness, there was no subsequent process in place to verify that employees had, in fact, reviewed the training materials.  (Schieldt Am. Decl. (dkt. #26) ¶ 5.)

An in-person training was conducted in June 2013 at multiple training sessions at the company's plants in both Stoughton and Brodhead; that training was mandatory for all supervisors and managers, including Jeff Lind.  While Lind did not attend, he signed an acknowledgment form on June 14, 2013, confirming that he "received and read" the training materials.  (Schieldt Decl., Ex. 3 (dkt. #15-3).)

Bell does not dispute that anti-discrimination and harassment policies existed, but he represents that racially discriminatory comments and behavior nevertheless occurred in the workplace.  Between 2011 and 2017, Stoughton Trailers' human resources department received at least two complaints from employees at Stoughton related to race.  One incident

12

report states that on December 27, 2012, an employee used the N-word and the term "porch monkey" when describing an encounter he had with an African-American individual outside of work. (Kennelly Decl., Ex. 5 (dkt #31-5) 1.) The report also indicates that the employee "used the racial slurs because [he] thought it was OK to do so." (*Id.*)

In response, Stoughton investigated the complaint and issued the employee a one-day disciplinary suspension. (Def.'s PFOFs (dkt. #24) ¶ 92.) Although it is unclear when, a second complaint was filed after another employee wrote the "N word" across the locker of an African-American employee. (Schieldt Dep. (dkt. #29) 42-43.) Finally, Bell recounts that he heard another employee stated that "F-cking N's are worthless" in reference to Bell while discussing employees' relative skills and abilities. (Pl.'s Resp. to Def.'s PFOFs (dkt. #33) ¶ 90; Peuvion Dep. (dkt. #21) 86.)

## OPINION

Defendant Stoughton Trailers seeks summary judgment based on plaintiff's failure to marshal "sufficient evidence to support a jury verdict of intentional discrimination" based on his race. *David v. Bd. of Tr. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Summary judgment is appropriate where the moving party establishes "that there is no genuine dispute as to any material fact," and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, "inferences relying on mere speculation or conjecture will not suffice," but rather, a nonmoving party with the burden of proof "must point to specific facts showing that there is a genuine issue for trial." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009).

While plaintiff asserts a discrimination claim on the basis of race in violation of

Title VII and Section § 1981, the Seventh Circuit generally has applied the same standard under either statute. *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). Specifically, a plaintiff must "produce enough evidence . . . to permit the trier of fact to find that his employer took an adverse action against him because of his race." *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013). Certainly, a reasonable jury *may* reject plaintiff's proof here, but the court is unable to conclude as a matter of law that *no* reasonable jury could so find for the reasons discussed below. Although a closer question, the court must similarly reject defendant's motion for summary judgment as to plaintiff's claim for punitive damages.

## I. Evidence of Discriminatory Animus

Traditionally, plaintiffs have marshalled their evidence of intentional discrimination through the so-called direct or indirect method. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1975) (articulating burden-shifting framework sometimes referred to as the "indirect" method of proving employment discrimination).[7] Recognizing that the evidentiary distinctions in these methods have proven stilted and difficult to discern, the Seventh Circuit has more recently endorsed consideration of the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself -- or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Golla v. Office of the Chief Judge of Cook Cty.*, 875 F.3d 404, 407 (7th Cir. 2017) (quoting *Ortiz v. Werner Enters.*,

---

[7] Title VII contemplates a mixed motive claim, but it does not appear that plaintiff is pursuing this theory. As such, the court only considers defendant's motion under a "because of" or "but for" causation standard.

*Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)) (affirming summary judgment on a reverse race discrimination claim where plaintiff only put forward evidence that he was white and his better-paid colleague was African-American).

Here, defendant's attempt to rigidly apply the traditional indirect and direct methods illustrates just how the fundamental, substantive legal issue can be lost. *See Ortiz*, 834 F.3d at 764 ("The use of disparate methods and the search for elusive mosaics has complicated and sidetracked employment-discrimination litigation for many years."). While the *McDonnell Douglas* framework remains useful, the ultimate question remains "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765. Moreover, the evidence presented may be direct or circumstantial. *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017).

In its briefing, defendant argues that plaintiff must "present evidence that <u>expressly</u> and <u>directly</u> proves that Lind terminated him because of his race," consistently underlining these terms as if by doing so will somehow transform its position into accepted law. (Def.'s Reply Br. (dkt. #39) 1.) Instead, defendant only underscores its obvious cherry picking of specific terms from earlier case law to remove consideration of circumstantial evidence, but this approach has *not* been embraced by the Seventh Circuit or the Supreme Court. To the contrary, because "'smoking gun' evidence of discriminatory intent is hard to come by," circumstantial evidence is commonly used to prove discrimination claims. *See Coleman*

*v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012).[8]

The Seventh Circuit has specifically identified four categories of intentional discrimination evidence: (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pre-textual reason for an adverse employment action. *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). Depending on its relative strength, each type of evidence may be sufficient by itself to support a judgment for the plaintiff; or they can be used together. *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Although none is overwhelming, plaintiff's evidence falls primarily in the second, third and fourth categories.

Squarely in the second category are Lind's alleged, ambiguous statements to Peuvion. To be sure, Lind did not use any racially derogatory terms, but his comments nevertheless led Peuvion to believe that Lind was referencing employees' worth and abilities in terms of their race and/or level of education. (Peuvion Dep. (dkt. #21) 37-39.) At his deposition, Peuvion stated that Lind's comments made it "very clear" that Lind believed that African-Americans "are less able to do work and . . . time shouldn't be wasted on them over other people." (*Id.* at 38.) By itself, Lind's alleged statement is insufficient

---

[8] Unless simply feigned, the source of defendant's apparent confusion as to the adequacy of circumstantial evidence to prove discriminatory intent under the direct method may be the unfortunate use of the words "direct" and "indirect" in describing methods of proof. The law is clear, however, that even under the "direct" method, circumstantial evidence can be considered. *See Coleman*, 667 F.3d at 845 ("Under the 'direct method,' the plaintiff may avoid summary judgment by presenting sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action.").

proof to show that anti African-American bias was the reason he fired plaintiff, but its probative value is strengthened when considered in conjunction with plaintiff Bell's and employees Hoskins' and Nash's impressions that Lind was generally harsher in tone and demeanor when interacting with African-American employees.[9]

In addition to Lind's alleged ambiguous behavior toward African-American employees, plaintiff points to the fact that he was terminated and his white co-worker Erbe was not for the same November 14 incident. "All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The 'similarly situated' prong establishes whether all things are in fact equal." *Filar v. Bd. of Educ.*, 526 F.3d 1054, 10661 (7th Cir. 2008) (citation omitted). There is no "magic formula" to determine whether a plaintiff has satisfied this prong; courts instead "apply a 'common-sense' factual inquiry—essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Humphries*, 474 F.3d at 405. The common features must be similar enough to "eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, [so as to] isolate the critical independent variable: complaints about discrimination." *Filar*, 526 F.3d at 1061 (citation omitted).

At least in title, it is undisputed that plaintiff and Erbe held the same role, and both reported to Lind at the time of plaintiff's termination. Not surprisingly, the parties analyze

[9] Defendant spends a significant portion of its reply brief arguing that this evidence fails to provide any specific examples, and therefore was too ambiguous to warrant consideration. (Def.'s Reply (dkt. #39) 4-6.) While this is a legitimate argument to make to the jury, plaintiff's evidence raises a question as to Lind's discriminatory animus, sufficient to credit it at summary judgment.

the duration of plaintiff's and Erbe's employment and his disciplinary history differently and disagree as well on the relative importance of those factors when comparing plaintiff to Erbe. On the one hand, plaintiff argues that despite a longer history of employment at Stoughton Trailers, Erbe and he had similar experience in the specific role of press operator. He further argues that his "sporadic" training on the brake press, and the fact that he "was often sent to work in assembly or to leave as a shear operator or to train shear operators," makes him similarly situated to Erbe in terms of relevant experience. (Bell Decl. (dkt. #30) ¶ 14.) Of course, defendant rightly emphasizes that Erbe was just months into his employment at Stoughton Trailers, while plaintiff had already been there for a number of years.

As for plaintiff's disciplinary history, Bell challenges both the severity and accuracy of any claimed performance issues. In particular, he notes that a number of reported issues with his performance were unsubstantiated, and he disputes allegations that there were "serious quality problems in terms of high scrap" and "multiple orders that were either done completely wrong or most of the parts were completed wrong." (Lind Decl., Ex. 2 (dkt. #25-2) 2.) Plaintiff further argues say that *Lind's* issuance of any earlier discipline is actually evidence of his "phony excuse or pretext to get rid of Bell because of his race." (Pl.'s Opp'n (dkt. #34) 12.) Accuracy aside, plaintiff also points out that he had successfully passed the 30-day review following the Extra Appraisal and continued to perform at acceptable levels until November 14, 2014.

On the other hand, defendant persuasively argues that Erbe's undisputed lack of a disciplinary record and gap in experience should preclude him from being similarly situated

to plaintiff. However, the fact that defendant has a *persuasive* argument is not the same as presenting evidence that precludes plaintiff from making a contrary argument to a jury based on conflicting evidence. Indeed, the existence of confounding variables does not necessarily or categorically preclude a finding that plaintiff and his comparator were similarly situated. *See Humphries*, 474 F.3d at 405 ("[W]e have emphasized that the similarly situated inquiry is a flexible one that considers all relevant factors, the number of which depends on the context of the case.") (internal citation omitted). In its submissions in support of entry of summary judgment, defendant does little more than address favorable evidence and make conclusory arguments, while failing to even address the pair's common features as alleged by plaintiff. At the very least, it is a question for the jury whether Bell's additional, if perhaps unrelated, experience and mixed disciplinary history rendered him "not similarly situated to" Erbe as a matter of fact. *See Eaton v. Ind. Dept. of Corr.*, 657 F.3d 551, 558 (7th Cir. 2011) ("In general, whether individuals are similarly situated is factual question for the jury") (internal quotation omitted).

Even if this were a close question, the court has yet to address plaintiff's strongest evidence of intentional discrimination. As previously noted, a "plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *see also Dickerson*, 657 F.3d at 601 (noting pretext as a fourth, distinct category of circumstantial evidence). Indeed, pretext is "one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive." *Reeves*, 503 U.S. at 134.

Here, plaintiff offers evidence that during the November 14 job, he did not stray from protocol and regularly checked to ensure that *his* side of each part was within specifications. Indeed, not just Bell, but his previous supervisor Peuvion, confirms this was protocol. Bell avers that he even regularly asked Erbe if his side was similarly in compliance, and Erbe never indicated that his side exhibited errors. Thus, plaintiff contends that all errors should have been attributed to Erbe. Moreover, since at least on summary judgment, there is a factual dispute over whether an operator was ever held responsible for the mistakes of another operator, plaintiff persuasively argues that his termination constituted a departure from standard practice, at least raising an inference of pretext.

In reply, defendant both disputes that it was an established practice to refrain from disciplining employees for the mistake of another, and further asserts that *Bell's* mistakes were unprecedented. Both constitute genuine disputed issues of material facts -- namely, what was the established procedure and whether the errors should have been attributed to Erbe, not Bell. Similarly, while defendant wants the court to treat Bell's signature on the work violation sheet and failure to dispute Lind's assigning of fault at the time of his firing as somehow legally precluding his later disputing the stated ground for firing, both are at most evidence that plaintiff will have to dispute at trial, not some kind of binding waiver of his rights under Title VII or Section 1981. Accordingly, the issue of whether defendant's proffered reason for terminating plaintiff is pretextual is a question for the jury. *See Culver v. Gorman & Co.*, 416 F.3d 540, 548 (7th Cir. 2005) (explaining that the accuracy of

defendant's characterization of plaintiff's behavior was "a jury question bearing on the issue of pretext").

Considered as a whole, plaintiff's evidence is far from overwhelming, but then neither is defendant's now that plaintiff has come forward with sufficient evidence from which a reasonable factfinder *could* conclude that plaintiff was terminated because of his race. Defendant's attempt to disregard much of this circumstantial evidence, and particularly its siloed analysis of each "category" of evidence, fails to address how the evidence, taken together, may give to an inference of discrimination. At this point, that is enough to move forward.[10]

## II. Punitive Damages

Defendant also moves for summary judgment as to plaintiff's claim for punitive damages. Title VII "authorizes an award of punitive damages when a plaintiff demonstrates that the defendant engaged in intentional discrimination 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857 (7th Cir. 2001) (quoting 42 U.S.C. § 1981a(b)(1)). For a plaintiff to be entitled to punitive damages, he must establish that the "employer's managerial agents recklessly disregarded his federally protected rights while acting within the scope of their employment." *Id.* at 858. Even if plaintiff does make such a showing,

---

[10] Defendant is nevertheless welcome to revisit by motion in limine the admissibility of at least some of this evidence -- like vague references to adverse actions against four or five African-American employees -- although, hopefully, this will not be viewed as an invitation for a wholesale attack on all of plaintiff's evidence.

moreover, the employer "may avoid liability for punitive damages if it can show that it engaged in good faith efforts to implement an antidiscrimination policy." *Id.*

As a general matter, the analysis to determine an employer's good faith is fact-intensive, but as defendant points out, "the implementation of a written or formal antidiscrimination policy is relevant to evaluating an employer's good faith efforts at Title VII compliance"; however, it is "not sufficient in and of itself to insulate an employer from a punitive damages award." *Id.* at 858; *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 835 (7th Cir. 2013). The essential issue on summary judgment then becomes whether a reasonable jury could conclude that the employer "did not engage in a good faith efforts" to implement its antidiscrimination policy. *E.E.O.C. v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 439 (7th Cir. 2012); *see also Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 483 (7th Cir. 2003); *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 663 (7th Cir. 2001).

Throughout plaintiff's employment here, there is no dispute that defendant maintained Anti-Harassment and Non-Discrimination policies and implemented mandatory participation of all supervisors and managers in Harassment and HR Legal Training. Those individuals were required to either attend the training in person or independently review the materials, then sign an acknowledgement form to indicate that they completed the training. At least one supervisor, Lind, did not attend the training in June 2013, but rather reviewed the materials and signed an acknowledgment form.

Despite these steps, plaintiff argues that defendants failed to engage in a *good faith* effort to implement the written policies. Specifically, he challenges the efficacy of allowing individuals to do nothing more than independently review training materials, because the

materials themselves consisted of "nothing more than a brief, bullet-point style outline of the in-person training." (Pl.'s Opp'n (dkt. #34) 18-19.) Beyond its potentially problematic format, plaintiff points out that when employees purportedly reviewed the material on their own, there existed "no mechanism for ensuring Lind and others actually read or understood" it. (*Id.* at 19.)

In addition, despite the existence of antidiscrimination policies, plaintiff argues that a number of alleged incidents of racial discrimination occurred in the workplace. In particular, between 2011 and 2017, two formal complaints of racial discrimination were filed with Human Resources, one of which included an employee using racially derogatory terms "because [he] thought it was OK to do so." (Kennelly Decl., Ex. 5 (dkt. #31-5) 1.) In addition to formal complaints, plaintiff avers that a co-worker stated that "F-cking N's are worthless," referring to himself, but that no one in front of whom the comment was made, including Peuvion, reported the comment. (Peuvion Dep. (dkt. #21) 86; Pl.'s Opp'n (dkt. #34) 21.) Similarly not reported were comments from "several people" suggesting "that due to . . . [Bell's] race and education, they felt [he] wasn't able to perform a job any more difficult than a sheer operator where you just do something really simple all day." (Peuvion Dep. (dkt. #21) 38).)

Should the jury find it reasonably probable that these incidents occurred and discount the bona fides of Stoughton's training efforts based on an employee's ability to easily bypass it, plaintiff certainly has to question Stoughton Trailer's good faith defense. And given that defendant is moving for summary judgment based on the application of a defense for which it bears the burden of proof, the court cannot conclude that this record

is "so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). Assuming intentional discrimination is found in the first phase of trial, therefore, a jury will be required to determine whether or not defendant engaged in a good-faith effort to implement its antidiscrimination policy as part of a second phase of trial. Accordingly, defendant's motion for summary judgment with respect to plaintiff's claims for punitive damages is denied.

## ORDER

IT IS ORDERED that defendant's motion for summary judgment (dkt. #22) is DENIED.

Entered this 29th day of November, 2018.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge